Filed 6/16/21  P. v. Kelly CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C086731 |
| Plaintiff and Respondent, | (Super. Ct. No. 17CF04354) |
| v. | |
| DANIEL BRYAN KELLY, JR., | |
| Defendant and Appellant. | |

On the evening of August 27, 2017, Stanley S. and defendant Daniel Bryan Kelly, Jr., got into an argument in front of Stanley S.'s house in Oroville.  During the argument, defendant pulled out a gun and fired two or three shots at Stanley S.  A jury convicted defendant of assault with a semiautomatic firearm (count 1), possession of a firearm by a felon (count 2), and possession of ammunition by a felon (count 3).

On appeal, defendant asserts (1) the evidence was insufficient to support his conviction of assault with a semiautomatic firearm, (2) the trial court erred in instructing

1

the jury on the elements of count 1, specifically in failing to define the term "semiautomatic firearm," (3) the trial court erred in failing to instruct on lesser included offenses on count 1, (4) with regard to counts 2 and 3, the trial court erred in allowing the prosecutor to admit evidence of the nature of defendant's prior convictions, rather than the fact that he sustained felony convictions, despite his willingness to stipulate to those convictions, (5) the trial court erred in instructing the jury on counts 2 and 3, (6) the trial court erred in permitting the prosecution to question a defense witness concerning her arrest record, (7) the prosecutor committed misconduct, and (8) the cumulative effect of these errors warrants reversal.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Defendant was charged in a felony complaint deemed an information with assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b) [statutory section references that follow are to the Penal Code unless otherwise stated]; count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3), and three counts of child endangerment (§ 273a, subd. (a); counts 4-6). The trial court ultimately granted the prosecutor's motion to dismiss counts 4 through 6.

It was further alleged that, in the commission of all counts, defendant was personally armed with a firearm within the meaning of section 12022.5, subdivisions (a) and (d) and section 1192.7, subdivision (c)(8). The information also alleged defendant had been convicted of a prior serious felony and was subject to sentencing pursuant to section 667, subdivision (b) through (j), and that he was also subject to a five-year "nickel prior" enhancement pursuant to section 667, subdivision (a)(1). Finally, the information alleged defendant was subject to one-year enhancements for each of four prior prison terms pursuant to section 667.5, subdivision (b).

2

## *The Prosecution Evidence*

Shawn S., who was 12 at the time of trial, lived with his father, Stanley S., his younger brother, and his two younger sisters. His mother, Julia K., was defendant's sister. Shawn S. testified that, one day the previous summer, defendant and defendant's father arrived to pick up Shawn S.'s grandmother, Cathi C.-K., who lived next door. They picked Cathi C.-K. up, drove off, and soon returned. When they returned, Cathi C.-K. and defendant were arguing. Cathi C.-K. entered Stanley S.'s house and spoke to Stanley S., who then went outside. Shawn S., his brother, and Julia K., who was holding Shawn S.'s two-year-old sister, followed. Stanley S. yelled at defendant and told him to leave. Stanley S. and defendant yelled at each other and Stanley S. threw a Red Bull can at defendant. Defendant, who had been in the front passenger seat of his father's car, got out of the car and pulled out a gun. Defendant's father also got out and told defendant to get back in. Defendant pointed the gun at Stanley S. and fired the gun twice. Defendant and his father both got back in the car and left. Stanley S. called 911.

Stanley S. did not testify at trial, but his 911 call was played for the jury. In the call, Stanley S. reported, "this is Stanley [S.]. Daniel Kelly is the one that fired the shots." When asked if anyone was injured, Stanley S. responded, "No, but me and my three children and my baby's mamma and her mother was standin' all within two feet of each other. The bullets hit right at her feet." Asked how many people were in the vehicle when defendant left, Stanley S. responded, "Two people. [Defendant's father] and [defendant]." The 911 operator and Stanley S. had the following exchange about the type of weapon used:

"911 Dispatch:      Okay. What kind of weapon did they use?

"Stanley [S.]:      It looked like a 9-millimeter, a silver and black one.

"911 Dispatch:      A silver and black what?

3

"Stanley [S.]:          Yeah semi-automatic.  Glock, it looked like.  They got that close with it.  He was that close with it.

"911 Dispatch:       Is it…

"Stanley [S.]:          There's bullet holes in the ground right where -- pardon?

"911 Dispatch:       Hold on.  Is it a handgun or is it a long gun?

"Stanley [S.]:          Yes.  No, no it's a handgun.

"911 Dispatch:       Okay.

"Stanley [S.]:          It's a Glock."

Asked who was holding the weapon, Stanley S. replied, "Daniel Kelly Junior.  He pointed it and fired at me and I ducked over where I - I - trying to get away from my kids and he fired two more times."  Later, Stanley S. told the 911 operator, "they were parked in the middle of the street and then I seen [defendant] with a gun in his hand and I stepped out here to the fence and I said, 'Hey you guys got to get out of here.  I don't know why you're here.  Get out of here.'  He jumps out, points the gun at me, I dodge, boom, boom, boom he's shooting at me."  Asked how many shots were fired, Stanley S. responded, "He fired three."

A neighbor called the Butte County Sheriff's Office sometime after 6:00 p.m. because she heard "argument, voices, male voices, and two shots, gunshots."  Asked on cross-examination whether she heard two or three gunshots, she responded, "I think it was two."

Shortly after 6:00 p.m. on August 27, 2017, Deputy Vong Vang, who was at the nearby Butte County Sheriff's Office in Oroville, was dispatched based on a call reporting gunshots.  Minutes later, when Vang arrived, he spoke with Stanley S.  Stanley S. was in front of his residence with his "estranged wife" Julia K. and their three children.  Vang spoke with Stanley S. about the incident, and then he spoke with Stanley S.'s sons.  While Stanley S. seemed calm, the boys, who were approximately six and eight, seemed "shocked, almost as if they were terrified."  According to Vang, both

4

boys, in unison, told him, "Uncle Danny or Uncle Daniel showed up to the residence and shot at their daddy." Vang also attempted to speak with Julia K., but she "would not say a single word to" Vang.

Upon examining the area, Vang found two fresh spent shell casings in the gravel in front of the residence, adjacent to the driveway. By "fresh," Vang meant they were not covered in dust or dirt, there was no rust on them, and they did not appear weathered or misshapen. The shell casings were for .380 auto ammunition. When he found them, the shell casings were approximately three to five feet apart from each other. Vang testified that most semiautomatic handguns have ejection ports on the right side of the firearm, so the spent shell casing will be ejected to the right.

Vang also found two "impact craters, impact marks" on the ground. Vang concluded they were impact marks "[b]ased on statements provided by [Stanley S.] . . . at the scene, [Vang's] very own experience with [the] gun range, seeing gunshots into the ground." Vang testified that the location of the shell casings and the location of the impact craters were consistent with the statement he took from Stanley S. Vang also identified two "trajectory marks on the ground" in photographs taken at the scene. The two trajectory marks were "essentially parallel with one another." Asked if there was anything about the trajectory marks that would be indicative of recency or lack thereof, Vang responded that there "were no disturbances in the trajectory marks on the ground."

Based on Stanley S.'s statements and Vang's observations of the scene, Vang concluded Stanley S. and the shooter had been within 20 to 30 feet of each other when the shots were fired. He also testified: "So the road is to the south of the residence. And then where the shell casings were in relation to the trajectory marks, the shell casings were southwest of the trajectory marks."

Vang collected the shell casings and took them into evidence. He then submitted them to the California Department of Justice for analysis as to whether "they were fired from a semiautomatic firearm or a revolver." Vang testified: "The results came back

5

from the Department of Justice stating that the two spent shell casings were either fired from a semiautomatic firearm or a fully automatic, I'm sorry, fully automatic firearm."

Kirsten Wallace, a senior criminalist at the California Department of Justice Crime Laboratory in Chico testified as an expert in firearms and ammunition analysis. Wallace examined the two shell casings. Wallace located ejector and extractor marks on both shell casings. She described ejectors and extractors as mechanisms used in semiautomatic and fully automatic firearms. Thus, Wallace concluded the bullets in the shell casings had been fired from a semiautomatic or fully automatic firearm. Subsequently, Wallace examined the shell casings again to determine if they had been fired from the same firearm. She observed that the firing pin impressions, breech face marks, extractor marks, and magazine lip marks on the shell casings matched each other, allowing her to conclude they had been fired from the same firearm.

Portions of a jail call between defendant and his father were played for the jury. During the call, the following statements were made:

"[Defendant]: But anyway, I - I was just defendin' myself, you know.

"[Defendant]: Hey, dad, listen dad, I'm so sorry. Please forgive me.

"[Defendant]: Well, listen, we're all fucked. . .

"Man 1: I fucked up. [It was undisputed "Man 1" is defendant's father.]

"[Defendant]: . . . we're fucked up.

"[Defendant]: That's where I fucked up I shouldn't have did that. I should have went out. I shouldn't of fuckin - I shouldn't of did - I shouldn't of did - I shouldn't of tried to fuckin enter - I shouldn't of tried to fuckin . . ."

### *The Defense Evidence*

Defendant's father testified that the day the alleged argument and shooting took place, defendant was with him at his condominium building in Sacramento helping with defendant's father's masonry work. Defendant was at the building the whole day,

6

helping with the work and playing videogames with a neighbor upstairs. Defendant's father denied he was at Stanley S.'s house on the day of the alleged incident. Defendant's father testified he had never seen defendant with a gun.

Defendant's father testified that, when in the jail call, defendant apologized to him, they were discussing the fact that defendant attempted to hang himself while incarcerated. Defendant's father also testified defendant told him: " 'But I didn't do something that they're accusing me of doing.' "

Julia K. was defendant's sister and Stanley S. was the father of her children. She recalled the police coming to the house. Julia K. became aware Stanley S. was calling 911 reporting an incident involving defendant and his father. However, she testified she did not see defendant or her father at the house that day. Julia K. testified: "I never seen my brother's face. I never seen my brother's face." She likewise testified: "I didn't see my father's face." Defense counsel asked, "When you say face, why do you --," and Julia K. responded: "Their person, their them. Them, themselves. When I think, okay, my Daniel, my brother, my father, dad, Daniel. Their faces, I did not see their faces there." Julia K. believed defendant was in Sacramento working that day. She also testified she did not hear anything that sounded like gunshots that day.

Cathi C.-K., defendant's and Julia K.'s mother, testified that, at the relevant time, she lived with Julia K., Stanley S., and her grandchildren. Cathi C.-K. did not hear anyone arguing and did not hear any gunfire on the day of the incident was alleged to have taken place. She testified that she had been trying to get defendant and his father, her former husband, to come watch a fight on television with her for her birthday, but neither showed up. Cathi C.-K. testified on cross-examination that she owned "a 45 and . . . two .380s." She testified that they were in storage. She testified that the guns were never at her house where she had been living with Julia K., Stanley S., and their children.

7

The jury found defendant guilty on counts 1 through 3. The jury found true the allegation that, in connection with count 1, defendant personally used a firearm within the meaning of section 12022.5, subdivision (a).

The trial court found that defendant had one or more prior serious or violent convictions within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (d), that he had a prior serious felony within the meaning of section 667, subdivision (a)(1), and that he had served four prior prison terms within the meaning of section 667.5, subdivision (b).

The trial court sentenced defendant to an aggregate term of 37 years four months, calculated as follows: the upper term of nine years on count 1, assault with a semiautomatic firearm, doubled pursuant to section 667, subdivision (b) through (i), eight months, one third the midterm, on count 2, felon in possession of a firearm, doubled pursuant to section 667, subdivision (b) through (i), the upper term of three years on count 3, felon in possession of ammunition, doubled to six years pursuant to section 667, subdivision (b) through (i), with the sentence on count 3 stayed pursuant to section 654, 10 years on the section 12022.5, subdivision (a), firearm enhancement, five years on the section 667, subdivision (a) "nickel prior," and one year for each of three prior prison terms pursuant to section 667.5, subdivision (b).

DISCUSSION

I

*Sufficiency of the Evidence — Count 1*

Defendant asserts the evidence was insufficient to support his conviction on count 1. According to defendant, "the prosecution failed to prove the element of section 245, subdivision (b) that requires that the firearm in issue be a 'semiautomatic' firearm as opposed to a machine gun or other type of firearm." Defendant asserts the evidence was

insufficient to establish "that the alleged firearm in issue was such that it could only discharge one round per pull of the trigger, and, using the force expended in discharging the first round, chamber another round, which, in turn, could only be fired by a subsequent trigger pull."

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

Section 245, subdivision (b), provides: "Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years." Thus, the prosecution was required to prove defendant committed an assault on Stanley S., and that he did so using a semiautomatic firearm.

As the Attorney General notes, our high court has stated: "A semiautomatic firearm 'fires once for each pull on the trigger and reloads automatically, but requires the shooter to release the trigger lever before another shot can be fired.' [Citation.] An automatic firearm 'will continue firing until either the trigger is released or the ammunition has been expended.' " (*In re Jorge M.* (2000) 23 Cal.4th 866, 874, fn. 4.)

The Penal Code contains the following, consistent definition: "As used in Sections 16900 and 31910, 'semiautomatic pistol' means a pistol with an operating mode that uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger." (§ 17140.)

Defendant argues that the evidence presented at trial did not exclude the possibility that defendant fired a fully automatic firearm, that is, that it was insufficient to prove that defendant fired a semi-automatic firearm.

Turning to the evidence presented to the jury, Shawn S. testified that, during defendant's argument with Stanley S., defendant got out of his father's car and pulled out a gun. Defendant pointed the gun at Stanley S. and fired the gun twice. The jury could reasonably conclude that this meant defendant pulled the trigger on the gun twice as opposed to holding the trigger down long enough to fire two bullets with a single pull of the trigger.

In his 911 call, Stanley S. reported defendant used what "looked like a 9-millimeter, a silver and black one." When the 911 operator asked, "A silver and black what?" Stanley S. responded, "Yeah semi-automatic. Glock, it looked like. They got that close with it. He was that close with it." He also clarified that it was a handgun, not a long gun, and again repeated, "[i]t's a Glock." Stanley S. told the 911 operator that defendant "pointed it and fired at me and I ducked over where I - I - trying to get away from my kids and he fired two more times." He also told the 911 operator that defendant "jumps out, points the gun at me, I dodge, boom, boom, boom he's shooting at me." He reported to the 911 operator defendant fired three shots.

10

A neighbor also called the Butte County Sheriff's Office and reported hearing an argument and two gunshots.

Deputy Vang testified that both of Stanley S.'s sons told him, "Uncle Danny or Uncle Daniel showed up to the residence and shot at their daddy." Vang found two fresh spent .380 auto shell casings in the gravel in front of the residence. Vang also found two "impact craters, impact marks" on the ground. Vang testified that the location of the shell casings and the location of the impact craters were consistent with the statement he took from Stanley S. Vang also identified two "trajectory marks on the ground" at the scene which were "essentially parallel with one another."

Vang submitted the shell casings to the California Department of Justice for analysis as to whether "they were fired from a semiautomatic firearm or a revolver."

Kirsten Wallace, the Department of Justice criminalist who testified as an expert in firearms and ammunition analysis, concluded that the bullets in the shell casings had been fired from a semiautomatic or fully automatic firearm. Her opinion was based on the presence of ejector and extractor marks on both shell casings and she described ejectors and extractors as mechanisms used in semiautomatic and fully automatic firearms. Wallace also testified the shell casings had been fired using the same firearm based on the firing pin impressions, breech face marks, extractor marks, and magazine lip marks.

Deputy Vang testified: "The results came back from the Department of Justice stating that the two spent shell casings were either fired from a semiautomatic firearm or a fully automatic, I'm sorry, fully automatic firearm."

In defendant's jail call to his father, he apologized to his father and claimed, "I was just defendin' myself, you know."

Viewing the record in the light most favorable to the judgment, we conclude that sufficient evidence supports the jury's guilty verdict on count 1. The evidence is sufficient to support the conclusion defendant fired shots at Stanley S. Stanley S. in his

11

911 call said three shots were fired, while Shawn S. and a neighbor testified two shots were fired.  Two shell casings were found at the scene.

The evidence is also sufficient to support the jury's determination that defendant used a semiautomatic handgun.  In his 911 call, Stanley S. specifically identified the firearm defendant used as a semiautomatic handgun.  He also indicated defendant "got that close with it.  He was that close with it."

Deputy Vang found two fresh .380 auto shell casings at the scene.  Both Vang  and Kirsten Wallace  testified the shell casings could have been fired using a semiautomatic or fully automatic firearm.

Substantial evidence supports the conclusion defendant assaulted Stanley S. using a semiautomatic firearm. (See *Jennings, supra*, 50 Cal.4th at pp. 638-639.)

Regarding Stanley S.'s 911 call, and his statement that defendant used a semiautomatic handgun, defendant asserts Stanley S. "never testified before the jury and his knowledge of firearms was never put before the court."  What defendant does not do is identify any requirement that the victim testify, or that the victim indicate the nature of his knowledge of firearms, in order for his statement to be credited.  And, of course, in reviewing for substantial evidence, it is not our role to reweigh the evidence presented to the jury.  (*Jennings, supra*, 50 Cal.4th at p. 638.)

With regard to Deputy Vang's testimony, in his opening brief, defendant asserts that Vang "testified that he had received a communication from the California Department of Justice that the shell casings were from a 'fully automatic' firearm . . . . " At best, this is one possible interpretation of Vang's testimony, and, at worst, it is a mischaracterization.  Vang testified:  "The results came back from the Department of Justice stating that the two spent shell casings were either fired from a semiautomatic firearm or a fully automatic, I'm sorry, fully automatic firearm."  Wallace, the Department of Justice criminalist who analyzed the shell casings, and likely reported her

12

findings to Vang or his colleagues, testified the shell casings could have been fired from either a semiautomatic or fully automatic firearm.

Defendant would characterize the progression of Vang's testimony as Vang correcting his earlier misstatement, and that the results indicated the shell casings were fired from a fully automatic firearm, not a semiautomatic firearm. However, another interpretation, and, in our view, a substantially more reasonable interpretation, particularly in light of Wallace's testimony and the structure of Vang's statement ("were *either* fired from . . ." [italics added]), is merely that his statement was interrupted in some manner and that he then repeated "fully automatic." At the very least, we can say that Vang's testimony gives rise to the potential for disparate interpretations. Viewing the evidence in the light most favorable to the judgment and presuming in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence (see *Jennings, supra*, 50 Cal.4th at pp. 638-639; accord, *People v. Sumahit* (2005) 128 Cal.App.4th 347, 352 [" '[i]n reviewing the record to determine the sufficiency of the evidence this court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment' "]), we conclude that Vang's testimony may be interpreted as indicating that the Department of Justice analysis indicated the shell casings could have been fired from a semiautomatic or fully automatic firearm. This is fully consistent with the testimony of Wallace, the criminalist who performed the analysis. Even were we to credit defendant's interpretation of Vang's testimony as reasonable, this would not be grounds for reversal. Because "the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, at p. 639.)

The Attorney General asserts that, to "the extent appellant argues the evidence did not prove the technical elements of a semiautomatic firearm, i.e., that only one round

13

could be expended per pull of the trigger, such technical evidence was not necessary. The term is one of common parlance." While defendant disputes this contention, he has not, in his opening brief or his reply brief, identified any case law to support his contention that the jury's determination was legally insufficient in the absence of more technical evidence as to the nature of the firearm he used and the details of its mechanical functioning.

In light of the evidence before the jury, we cannot say that, " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict' " on count 1. (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

II

*The Trial Court's Instructions on Count 1*

The trial court instructed the jury with CALCRIM No. 875, in part, as follows: "The defendant is charged in Count 1 with assault with a semiautomatic pistol. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a semiautomatic pistol that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person." The court further instructed the jurors in that instruction that the "term *firearm* is defined in another instruction to which you should refer." At the jury instruction conference, defense counsel stated he had no objection to CALCRIM No. 875.

In its instruction on unlawfully possessing a firearm, CALCRIM No. 2510, the court instructed the jury, in part, "[a] *firearm* is any device designed to be used as a weapon, from which a projectile is expelled or discharged through a barrel by the force of

14

an explosion or other form of combustion.  The frame or receiver of such a *firearm* is also a *firearm* for the purpose of this instruction."

The court also instructed the jurors with CALCRIM No. 200, in part, as follows: "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use.  These words and phrases will be specifically defined in these instructions.  Please be sure to listen carefully and follow the definitions that I give you.  Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

"[T]he use of a semiautomatic firearm is a necessary element of section 245, subdivision (b)."  (*People v. Le* (2015) 61 Cal.4th 416, 427.)  Section 245, subdivision (b), itself does not define "semiautomatic firearm."  However, as defendant notes, a bracketed portion of CALCRIM No. 875 provides:  "A *semiautomatic pistol* extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."  The Bench Notes for CALCRIM No. 875 advise:  "Give the relevant bracketed definitions unless the court has already given the definition in other instructions.  In such cases, the court may give the bracketed sentence stating that the term is defined elsewhere."  The trial court did not give the jury the bracketed definition.

Defendant asserts that the trial court erred in failing to define all elements of the crime charged in count 1, specifically the term "semiautomatic firearm," and thus the court "gave the jury a definition that lowered the prosecution's burden of proof."

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . .' "  (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.)  " 'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' "  (*People v. Rivera* (2019) 7 Cal.5th 306, 332, quoting *People v. Merritt* (2017) 2 Cal.5th 819, 824.)

15

Specifically relevant here, "[a] court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law." (*People v. Bland* (2002) 28 Cal.4th 313, 334; accord *People v. Krebs* (2019) 8 Cal.5th 265, 331 ["[a] court's duty to define statutory terms 'arises where the terms have a technical meaning that is peculiar to the law' "].) "The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] Thus, . . . terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada* (1995) 11 Cal.4th 568, 574-575 (*Estrada*).) " 'If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 296 (*Lucas*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

As stated *ante*, our high court has described "semiautomatic firearm" as follows: "A semiautomatic firearm 'fires once for each pull on the trigger and reloads automatically, but requires the shooter to release the trigger lever before another shot can be fired.' " (*In re Jorge M., supra*, 23 Cal.4th at p. 874, fn. 4.) A typical nonlegal dictionary definition of semiautomatic is: "*of a firearm* : able to fire repeatedly through an automatic reloading process but requiring release and another pressure of the trigger for each successive shot." (Merriam-Webster English Dict. Online <https://perma.cc/8CKA-QT4Z > [as of June 10, 2021].) These definitions, the former

employed by our high court, the latter in a nonlegal dictionary of typical English usage, are consistent and highly similar.

We conclude the term "semiautomatic firearm" as relevant here "is not used in a technical sense peculiar to the law." (*Estrada, supra*, 11 Cal.4th at p. 574.) The term is not used in a way that "*differs* from its nonlegal meaning" or from "the meaning that might be ascribed to the same terms in common parlance." (*Id*. at pp. 574-575.) Consequently, the trial court had no duty to instruct the jury sua sponte as to its meaning.

If defendant wanted the term defined, it was his obligation to request an instruction. (*Id*. at p. 574; accord, *Lucas, supra*, 60 Cal.4th at p. 296.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).)

In the trial court, defendant failed to request the bracketed instruction defining "semiautomatic pistol" or any other clarification of CALCRIM No. 875. As the Attorney General asserts, because the trial court had no sua sponte duty to give the bracketed instruction defining "semiautomatic pistol" or other clarification of CALCRIM No. 875, by failing to request such clarification, defendant forfeited his contention the trial court erred in its instruction on count 1. (See *Lee, supra*, 51 Cal.4th at p. 638; *Jennings, supra*, 50 Cal.4th at p. 671 [" 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

Defendant asserts that, even though he failed to raise the issue in the trial court, the error in failing to define "semiautomatic firearm" affected his substantial rights. (§ 1259.) Under section 1259, an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." "[T]he failure to object to an

17

instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; accord, *People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

We determined in part I of our Discussion, *ante*, that the evidence was sufficient to support defendant's conviction on count 1 of assault with a semiautomatic firearm. Condensing that evidence, Shawn S. testified that defendant pulled out a gun, pointed it at Stanley S., and fired the gun twice. Stanley S. reported to the 911 operator that defendant fired three shots at him with a semiautomatic handgun. A neighbor heard two gunshots. Deputy Vang responded to the scene where Stanley S.'s two sons told Vang defendant shot at Stanley S. Vang found two fresh .380 auto shell casings at the scene, as well as two trajectory marks on the ground and two impact craters. Vang submitted the shell casings to the Department of Justice for analysis as to whether "they were fired from a semiautomatic firearm or a revolver." Analysis revealed the shell casings were fired using either a semiautomatic or fully automatic firearm.

Against this evidentiary backdrop, we conclude the claimed error did not result in a miscarriage of justice and that it is not reasonably probable defendant would have obtained a more favorable result had the trial court instructed the jury that "[a] *semiautomatic pistol* extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger." (CALCRIM No. 875.) Accordingly, the trial court's omission of this bracketed portion of the instruction did not affect defendant's substantial rights.

Defendant also contends the trial court's purported error was compounded when it referred the jury to CALCRIM No. 2510 for the definition of "firearm" because, as a result, "the jury was never told that they were required to find that the alleged 'firearm' in issue was a 'semiautomatic' firearm as that term is defined by law." Defendant's contention is without merit and belied by the record. CALCRIM No. 875 as given by the trial court explicitly required the jury to determine, among other things, that "defendant did an act *with a semiautomatic pistol*," and that, "[w]hen the defendant acted, he had the present ability to apply force *with a semiautomatic firearm* to a person." (Italics added.) We have determined that "semiautomatic firearm" as used here was not used in a way that "*differs* from its nonlegal meaning." (*Estrada, supra*, 11 Cal.4th at pp. 574-575.) The trial court's definition elsewhere of the more general term "firearm" did not relieve the jury of its obligation to find defendant used a semiautomatic firearm in order to find him guilty on count 1.

III

*Failure to Instruct on Lesser Included Offenses*

Defendant asserts the trial court erred in failing to instruct sua sponte on count 1 on the lesser included offenses of simple assault (§§ 240, 241) and assault with a firearm (§ 245, subd. (a)(2)). Defendant asserts it is reasonably probable that, had the jury been instructed with these lesser included offenses, it would have returned a different verdict. (See *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).)

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) " 'That obligation has been held to include giving

19

instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*Id*. at pp. 154-155.)

The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Ibid*.) " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403, quoting *Breverman*, at p. 162.)

The Attorney General does not dispute that simple assault (§§ 240, 241) and assault with a firearm (§ 245, subd. (a)(2)) are lesser included offenses of assault with a semiautomatic firearm (§ 245, subd. (b)). (Cf. *People v. Miceli* (2002) 104 Cal.App.4th 256, 272 ["The trial court instructed on assault [citation] as a lesser included offense of assault with a semiautomatic firearm"]; *People v. Martinez* (2012) 208 Cal.App.4th 197, 199 ["firearm assault is a lesser included offense of a semiautomatic firearm assault"].) We assume for purposes of this discussion that this is correct.

Simply put, there is no evidence whatsoever, let alone substantial evidence, defendant committed only simple assault and not assault with a semiautomatic firearm. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent

20

injury on the person of another." (§ 240.) While defendant denied he was present or committed any type of assault, all of the relevant evidence indicated that he fired two or three shots from a firearm at Stanley S. Stanley S. described the firearm to the 911 operator as a semiautomatic, and Wallace's and Vang's testimony indicated the shell casings Vang found at the scene were fired from a semiautomatic or fully automatic firearm. The evidence before the jury did not constitute evidence from which a jury of reasonable persons could conclude defendant committed the lesser offense of simple assault (§§ 240, 241), but he did not commit the greater offense of assault with a semiautomatic firearm (§ 245, subd. (b)). (See *Romero, supra*, 44 Cal.4th at p. 403; *Breverman, supra*, 19 Cal.4th at p. 162.)

As for assault with a firearm, section 245, subdivision (a)(2), provides: "Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and imprisonment."

There was no evidence in the record defendant used a revolver. When Vang submitted the shell casings to the Department of Justice, he did so for analysis as to whether "they were fired *from a semiautomatic firearm or a revolver*." (Italics added.) Wallace's analysis revealed they were not fired from a revolver, but instead from a semiautomatic or fully automatic firearm.

Notwithstanding Wallace's conclusion the shell casings were consistent with having been fired from a semiautomatic or fully automatic firearm, there was no evidence in the record defendant used a fully automatic firearm. Again, Stanley S. told the 911 operator defendant used a semiautomatic firearm. He said the gun defendant used "looked like a 9-millimeter, a silver and black one." When the 911 operator asked, "A silver and black what?" Stanley S. responded, "Yeah semi-automatic. Glock, it looked like. They got that close with it. He was that close with it."

21

Thus, there was evidence defendant used a semiautomatic firearm, but there was no evidence he used a revolver or a fully automatic firearm. The evidence before the jury did not constitute evidence from which a jury of reasonable persons could conclude that defendant committed the lesser offense of assault with a firearm (§ 245, subd. (a)(2)), but did not commit the greater offense of assault with a semiautomatic firearm (§ 245, subd. (b)). (See *Romero, supra*, 44 Cal.4th at p. 403; *Breverman*, *supra*, 19 Cal.4th at p. 162.)

The trial court did not err in failing to instruct the jury sua sponte on these lesser included offenses.

IV

*Admission of the Nature of Defendant's Prior Convictions*

For counts 2 (§ 29800, subd. (a)(1) [possession of a firearm by a felon]) and 3 (§ 30305, subd. (a)(1) [possession of ammunition by a felon]), the prosecution was required to prove, among other things, that defendant had previously been convicted of a felony. In her in limine motions the prosecutor sought to "ask [the defendant] about several prior felony convictions" in the event defendant testified. In his in limine motions, defendant asserted the prior convictions the prosecution proposed to admit did not involve a firearm and were not crimes of moral turpitude, and therefore should be inadmissible.

In discussing in limine motions, the trial court deferred on the issue pending a determination as to whether defendant intended to testify. However, the court stated: "The one caveat here is that . . . , because of the charges, felon in possession of a firearm and ammunition, the district attorney will be required to offer evidence of some felony convictions just to make, to substantiate those particular charges. That would be separate from credibility issues." Defense counsel acknowledged the prosecution must be allowed to prove defendant had been convicted of a felony, but stated he did not "want the jury to

22

hear that it's a gun felony because I think that may be overly prejudicial because he is on trial for gun charges." The following exchange ensued:

"THE COURT: Would it be reasonable . . . to enter into a stipulation to at least satisfy that element of those two counts?

"[THE PROSECUTOR]: I guess I'm not, I'm not clear what Counsel's requesting.

"THE COURT: I think the problem, I think what he's essentially requesting is a stipulation to the fact that [defendant] has been convicted of a felony for purposes of Count[] Two and Count Three.

"[THE PROSECUTOR]: No. I won't stipulate to that.

"THE COURT: All right.

"[THE PROSECUTOR]: I understand that there can be a sanitation, sanitation of the nature of the felonies. And I think that's normal for there to not be a reference to the nature of the felonies for these types of charges. But I'm not comfortable with stipulating to the fact that he's been convicted of a felony, because he's in fact been convicted of a number of felonies that I would like the jury to be aware of if he's not going to admit to that.

"THE COURT: Without, though, necessarily referring to the particular charge --

"[THE PROSECUTOR]: Correct.

"THE COURT: -- and explanation of that Penal Code Section violation.

"[THE PROSECUTOR]: Correct. Unless he testifies.

"THE COURT: Right

"[THE PROSECUTOR]: That's our caveat, as the Court pointed out.

"THE COURT: I think that, [defense counsel], covers it for you. I think the people intend, they need to prove the elements of the charge. But my understanding is --

" . . . correct me if I'm wrong.

23

"-- is you don't need to actually, in identifying the prior felonies, state the nature of the felony or the code section.

"[THE PROSECUTOR]: Correct.

"THE COURT: That's your concern?

"[DEFENSE COUNSEL]: Yeah, that's my concern.

"THE COURT: I think we're okay on that. Is that right?

"[THE PROSECUTOR]: I think we understand where we're at with that."

Prior to closing her case-in-chief, the prosecutor indicated she "ha[d] all of" defendant's section 969b files to prove defendant's prior convictions. The court proposed: "why don't we go ahead and do the 969b now?" The prosecutor indicated she intended to explain what the files were, where they come from, the fact that they are certified, and what they demonstrate. Defense counsel did not object, though he did say, "I'm willing to say just that. But if you need to go more into it, it hurts my client."

We note that Section 969b provides, in pertinent part: "For the purpose of establishing prima facie evidence of the fact that a person being tried for a crime or public offense under the laws of this State has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefor in any penal institution, . . . the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence."

Before the jury, the prosecutor began to address People's exhibits 9 and 10, the section 969b files, when defense counsel objected, stating that the material was "[o]verly prejudicial," and that "there's another way we can do this." The prosecutor noted that the files included "the Complaint, the plea form, and et cetera . . . ." However, after the court explained to the jury what the parties were discussing, the prosecutor proposed to proceed and defense counsel did not object. The prosecutor explained that exhibits 9 and 10 were

24

certified documents addressing prior felony convictions from Tehama County and that exhibit 11 would address prior felony convictions from Sacramento County. Additionally, exhibit 12 was "another set of documents certified by [CDCR]." She then stated, "When you deliberate in this case, you will need to review those four exhibits and establish whether or not there is proof sufficient in those documents to establish the defendant has been previously convicted of the felony offenses that have been alleged in this case."

Defense counsel objected on the grounds that the materials were overly prejudicial, and further stated the "elements that Counsel are trying to meet could have been done in a much less revealing fashion, and I think that it's overly prejudicial." The trial court overruled the objection, "subject to the Court reviewing the documents to determine whether they will actually be received into evidence."

At the jury instruction conference, defense counsel requested the jury be instructed that the prosecution alleged defendant had been convicted of a felony so as to avoid going into the prior crimes, as doing so would be overly prejudicial. The prosecutor's response was, "[w]ell, they are going to hear about it, assuming that the Court allows the People's exhibits into evidence. [¶] And the People have alleged specifically separate crimes, dates, and places on the charging document that we have the burden of proving. Any prior conviction can be argued as being overly prejudicial, but it's still an element I have to prove in order to prove the underlying offense." Defense counsel reiterated that the priors could be proved simply by stating defendant had been convicted of prior felonies.

In her closing argument, the prosecutor stated defendant had been convicted of a number of felonies, and referred to exhibits 9 through 12. She then stated: "I would note to you the most recent conviction. 2015, convicted of a violation of 29800, felon in possession of a firearm. The very same crime he is accused of committing on August 27th."

On appeal, defendant asserts the trial court erred in allowing the prosecution to present evidence of the nature of his prior convictions after the prosecutor refused to accept defendant's proposed stipulation that he was a convicted felon.

The Attorney General does not dispute defendant was willing to stipulate to having a prior felony conviction to satisfy that element of counts 2 and 3. As the Attorney General also acknowledges, the trial court nonetheless admitted documentary evidence that included the nature of defendant's prior felony convictions, and the prosecutor referred to the nature of one of those felony convictions in closing argument. The Attorney General concedes it was error to admit the nature of defendant's prior convictions in light of this willingness to stipulate.

Our high court's decision in *People v. Valentine* (1986) 42 Cal.3d 170 (*Valentine*) "interpreted article I, section 28, subdivision (f) of the California Constitution, added to the Constitution by Proposition 8, an initiative that the California electorate passed in 1982. It states: 'When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court.' [Citation.] *Valentine* concluded that the language was directed at *People v. Hall* (1980) 28 Cal.3d 143, which held that when an element of a charged offense requires proof that the defendant has a felony conviction, and the defendant offers to stipulate to the prior conviction, it is error to inform the jury either of the fact that the defendant has a prior felony conviction or the nature of the felony." (*People v. Sapp* (2003) 31 Cal.4th 240, 261 (*Sapp*), quoting *Valentine*, at pp. 153-154.) "*Valentine* held that article I, section 28(f) eliminated 'the per se rule of *Hall*' by requiring that the jury be advised that the defendant has suffered a prior felony conviction if such felony conviction is an element of a current charge. [Citation.] But if the defendant offers to stipulate to a prior felony conviction, article I, section 28(f) allows evidence of the *nature* of that felony to be withheld from the jury. [Citation.] Thus, . . . *Valentine* allows one of two alternatives when a defendant's prior felony conviction is an element of a charged crime: (1) The prosecution can prove the conviction in open court,

26

and that proof can include both the fact that the defendant has previously been convicted of a felony offense as well as the nature of the felony involved; or (2) *the defendant can stipulate to having a felony conviction and thereby keep from the jury the nature of the particular felony.*" (*Sapp*, at p. 261, italics added.)

We agree with the parties that, in the face of defendant's offer to stipulate to prior convictions for purposes of that element in counts 2 and 3, under *Valentine*, the trial court erred in admitting evidence proving the *nature* of defendant's prior convictions.

Defendant asserts this error violated both state law standards and his right to due process and asserts the error was prejudicial under any standard. The Attorney General responds, "[a]lthough the trial court erred in allowing evidence of the nature of [defendant's] prior convictions, the error was harmless" under the standard for state law error. (See *Watson, supra*, 46 Cal.2d at p. 836.)

In determining the prejudicial effect of a trial court's error in admitting the nature of prior convictions in this context, we consider whether it "appears 'reasonably probable,' in appellate parlance, that a verdict more favorable to defendant would have been returned had the error not occurred." (*Valentine, supra*, 42 Cal.3d at p. 183, quoting *Watson, supra*, 46 Cal.2d at p. 836; accord, *People v. Stewart* (2004) 33 Cal.4th 425, 477-478 [employing the *Watson* standard to the type of error described in *Valentine*].) "The prejudicial effect inherent in evidence of prior offenses varies with the circumstances of each case. Factors that affect the potential for prejudice include the degree to which the prior offense is similar to the charged offense, how recently the prior conviction occurred, and the relative seriousness or inflammatory nature of the prior conviction as compared with the charged offense." (*People v. Wade* (1996) 48 Cal.App.4th 460, 469 (*Wade*), citing *People v. Calderon* (1994) 9 Cal.4th 69, 79.)

The jury had before it exhibits setting forth defendant's prior convictions. People's exhibit 11 included a May 12, 2008, abstract of judgment indicating defendant's conviction of first degree burglary in Sacramento County. (§ 459.) Another abstract of

27

judgment bearing the same date indicated defendant had been convicted in Sacramento County of attempting to evade a peace officer while driving recklessly. (Veh. Code, § 2800.2, subd. (a).) Another abstract of judgment in exhibit 11, filed February 23, 2012, in Tehama County, demonstrated defendant was convicted of unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)), two counts of receiving stolen property (§ 496, subd. (a)), two counts of second degree burglary (§ 459), one count of receiving a stolen vehicle (§ 496d, subd. (a)), and one count of petty theft with a prior conviction (§ 666). People's exhibit 12 contained an abstract of judgment filed December 9, 2015, in Tehama County, indicating defendant had been convicted of possession of a firearm by a felon. (§ 29800, subd. (a)(1).)

Only the latest prior conviction bore any similarity to the charged offenses. It was, indeed, a conviction for the same offense he was charged with in count 2. The other offenses were not similar to the charged offenses.

The most recent among the priors was defendant's conviction of possession of a firearm by a felon (§ 29800, subd. (a)(1)) on November 6, 2015. This was more than one year nine months prior to the events at issue here. The other prior convictions were more remote, dating to May 12, 2008, more than nine years prior to the events at issue here.

As compared with the charged offenses, the prior convictions were not particularly serious or inflammatory. Count 1 charged defendant with assault with a semiautomatic firearm (§ 245, subd. (b)) based on his actions in firing two or three shots at Stanley S. during an argument, at a time when Stanley S.'s children and Julia K. were nearby. This is far more serious and inflammatory than defendant's prior convictions, which included first degree burglary (§ 459), attempting to evade a peace officer while driving recklessly (Veh. Code, § 2800.2, subd. (a)), a number of theft-related crimes as well as second degree burglary (§ 459), and possession of a firearm by a felon. (§ 29800, subd. (a)(1).)

Weighed against these considerations of similarity, recency, and seriousness (see *Wade, supra*, 48 Cal.App.4th at p. 469), the evidence against defendant was considerable.

28

As detailed already, Shawn S. testified that defendant got out of his father's car, pulled out a gun, pointed it at Stanley S. and fired the gun twice. Stanley S. told the 911 operator defendant fired three shots at him with a semiautomatic firearm and that defendant got close with it. A neighbor heard two gunshots. Deputy Vang found two fresh spent .380 auto shell casings, two trajectory marks, and two impact craters consistent with the statement Stanley S. gave to him. Stanley S.'s two sons told Vang defendant shot at Stanley S. Department of Justice analysis revealed the shell casings were fired using the same semiautomatic or fully automatic firearm. In a jail call to his father, defendant apologized to his father and claimed, "I was just defendin' myself, you know."

Defendant's evidence, on the other hand, amounted to his father, mother, and sister testifying he was nowhere near the scene at the time of the shooting, an account that it appears none of them offered to authorities at any time prior to trial. Julia K. and Cathi C.-K. also testified that they did not hear gunshots on the day in question, testimony that is belied by the physical evidence as well as eyewitness testimony.

In light of the evidence of defendant's guilt on all counts and our consideration of relevant factors in connection with the admission of the nature of defendant's prior convictions (see *Wade, supra*, 48 Cal.App.4th at p. 469), we conclude it is not reasonably probable defendant would have obtained a more favorable verdict had the trial court properly accepted the defense stipulation to the fact of defendant's prior convictions. (See *Valentine, supra*, 42 Cal.3d at p. 183; *Watson, supra*, 46 Cal.2d at p. 836.)

Finally, in his reply brief, defendant asserts the Attorney General conceded his argument that the erroneous admission of "prior bad act" evidence can result in the deprivation of a defendant's right to due process and a fair trial by the Attorney General failing to contest the argument. Defendant asserts that this "concession" means that the applicable standard to review for prejudice is the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).

Defendant overreaches. The Attorney General maintained that the error complained of did not rise to the level of a violation of defendant's constitutional rights, and, based on case law from our high court (*Valentine, supra*, 42 Cal.3d at p. 183), the applicable standard of review is the state law standard in *Watson, supra*, 46 Cal.2d 818. As set forth *ante*, we agree with the Attorney General that the error did not deprive defendant of his constitutional rights and *Watson* supplies the appropriate standard of review as stated by our high court in *Valentine*. The Attorney General's briefing did not constitute a concession.

V

*The Trial Court's Instructions on Counts 2 and 3*

Defendant asserts the trial court erred in its instructions on counts 2 and 3. With regard to count 2, he asserts that, the trial court instructed the jurors with CALCRIM Nos. 2511 and 2591, which apply when the defendant agrees to stipulate to prior convicted felon stats. In this manner, defendant asserts the prosecution both enjoyed the opportunity to present evidence of his prior convictions while at the same time, by indicating that the parties stipulated defendant had sustained a prior felony conviction, the court, in effect, directed a verdict for the prosecution on that element as to each count. Defendant further emphasizes the jury was instructed not to consider his prior convictions for any other purpose except for the limited purpose of assessing his credibility despite the fact that he did not testify. The instruction that the jury may consider the evidence defendant was previously convicted of a felony only in deciding whether the prosecution had proved that element of the crime was not given.

" 'The meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire

30

record of trial, and the arguments of counsel.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312 (*Mathson*).) This review requires that we look not only at the challenged instruction, but also at the instructions as a whole in the context of the entire trial record. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 617 (*Mejia*).) " ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*Mathson*, at p. 1312.)

On count 2, the trial court instructed the jury with CALCRIM No. 2510, in pertinent part, as follows: "The defendant is charged in Count 2 with unlawfully possessing a firearm. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant possessed a firearm; [¶] 2. The defendant knew that he possessed the firearm; [¶] 3. The defendant had previously been convicted of a felony." CALCRIM No. 2510, as given, contained no reference to either a stipulation that defendant was previously convicted of a felony or direction as to the limited purposes for which the jury could consider evidence presented relevant to defendant's prior conviction of a felony. Defendant at the jury instruction conference did not object to CALCRIM No. 2510 as proposed.

Defendant premises his arguments regarding count 2 on CALCRIM No. 2511. However, as the Attorney General correctly observes, CALCRIM No. 2511 was withdrawn and was not given to the jury. That instruction appears in the clerk's transcript on appeal in the packet of instructions *not given to the jury*. Thus, defendant's reliance on the language of CALCRIM No. 2511 as constituting instructional error is wholly misplaced. Defendant's contention that the trial court "direct[ed] a verdict for the prosecution on that element," based on the stipulation language in CALCRIM No. 2511, "which is clearly contrary to the requirement that they prove every element beyond a reasonable doubt," is without merit. The instruction on which he bases his argument was not given.

31

Moreover, the trial court's instruction on count 2, CALCRIM No. 2510, as given, made no reference whatsoever to defendant's prior convictions, beyond stating that one of the three elements the prosecution was required to prove was that defendant had previously been convicted of a felony.

Thus, nothing in the instructions given with regard to count 2 gave rise to any potential error of the type defendant raises.

The trial court instructed the jury on count 3 with CALCRIM No. 2591, in pertinent part, as follows: "The defendant is charged in Count 3 with unlawfully possessing ammunition. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant possessed ammunition; [¶] 2. The defendant knew he possessed the ammunition; [¶] 3. The defendant had previously been convicted of a felony. [¶] . . . [¶] *Do not consider this fact for any other purpose except for the limited purpose of determining defendant's credibility. Do not speculate about or discuss the nature of the conviction*." (Italics added.)

The omitted language represented by the ellipsis, prior to the italicized language, did not pertain to defendant's prior felony convictions, but rather to the definition of ammunition and guidance on possession. The trial court had stricken language from the instruction stating that the parties had stipulated to the fact that defendant had sustained a prior felony conviction. Thus, having stricken the stipulation language, the language italicized above was the first reference to any evidence of a prior conviction and referred, abruptly and inexplicably, to "this fact" and "the conviction," the subject of the stricken language. Defendant did not object to CALCRIM No. 2591 as proposed at the jury instruction conference.

Considering the instructions on counts 2 and 3, and the instructions "as a whole in the context of the entire trial record" (*Mejia, supra*, 211 Cal.App.4th at p. 617), we conclude that there is no " ' "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the

32

arguments of counsel.' " (*Mathson, supra*, 210 Cal.App.4th at p. 1312.) Contrary to defendant's contention, the trial court did not, in effect, direct a verdict for the prosecution on the prior felony conviction element of counts 2 and 3. The court did not instruct the jury that the parties stipulated to a prior conviction.

The court did instruct the jury as to count 3: "Do not consider this fact for any other purpose except for the limited purpose of determining defendant's credibility. Do not speculate about or discuss the nature of the conviction." "This fact" in the first sentence was undefined. Additionally, with regard to the first sentence limiting consideration of "this fact" to assessing defendant's credibility, defendant did not testify at trial.

Elsewhere, the trial court instructed the jury: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, following the instructions that do apply to the facts as you find them." (CALCRIM No. 200.) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.) Obviously, the jury could have disregarded instructions pertaining to assessing defendant's credibility when defendant did not testify.

As for the second sentence of this portion of CALCRIM No. 2591, "[d]o not speculate about or discuss the nature of the conviction," at most, the jury would have quite harmlessly interpreted this as direction not to speculate about the underlying facts of defendant's convictions set forth in the 969b packets. As for the nature of the convictions themselves, distinguished from the underlying facts, the instruction harmlessly told the jury not "speculate about or discuss the nature of the conviction," which had been, wrongly (see part IV of the Discussion, *ante*), placed before the jury.

33

"It has been held that the giving of inapplicable instructions, correct in the abstract, is not ground for a reversal." (*People v. Boggs* (1936) 12 Cal.2d 27, 37; accord, *People v. Cross* (2008) 45 Cal.4th 58, 67 [giving an irrelevant or inapplicable instruction is generally technical error not warranting reversal].) There is no " ' "reasonable likelihood" that the jury misconstrued or misapplied the law' " in the manner contended by defendant " 'in light of the instructions given, the entire record of trial, and the arguments of counsel.' " (*Mathson, supra*, 210 Cal.App.4th at p. 1312.)

Defendant also notes the "jury was never given the language contained in both CALCRIM Nos. 2510 and 2590 that they 'may consider evidence, if any, that the defendant was previously convicted of a crime only in deciding whether the People have proved this element of the crime.' " Trial courts generally have no sua sponte obligation to instruct on the limited purpose for which uncharged act evidence can be used. (*People v. Lang* (1989) 49 Cal.3d 991, 1020.) " 'When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051, quoting Evid. Code, § 355.) "Thus, although a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*Hernandez*, at p. 1051.) It was incumbent upon the defendant to request the instruction. His failure to do so forfeits his contention on appeal. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 [trial court was under no sua sponte duty to give an instruction as to limited purpose of evidence; the defendant's failure to request such an instruction forfeits the claim of error on appeal]; *People v. Clark* (2011) 52 Cal.4th 856, 942 (*Clark*) [failure to request instruction concerning limited purpose of expert testimony resulted in forfeiture].) Our high court in *People v. Collie* (1981) 30 Cal.3d 43 recognized "a possible exception" to the general rule that a court has no sua sponte duty to instruct on the limited use of evidence. (*Hernandez*, at pp. 1051-1052.)

34

That possible exception may arise "in 'an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' " (*Ibid*., quoting *Collie*, at p. 64.) This is not such a case.

*The Prosecution's Cross-examination into Julia K.'s Arrest Record*

Defendant asserts the trial court erred and violated due process in permitting the prosecution to inquire of Julia K. as to her arrest record for petty theft. Defendant asserts that the evidence of Julia K.'s arrest was inadmissible as it was hearsay and unduly prejudicial.

At the commencement of her cross-examination of Julia K., the prosecutor asked her if she had been arrested in Oregon. Julia K. responded, "I was arrested for some crimes that I wasn't involved in." The prosecutor pressed Julia K. on what she had been arrested for and defense counsel objected, without elaboration. Asked if she was arrested for forgery, Julia K. responded, "I was not convicted of none of those crimes. I have no felony record." Defense counsel again objected without elaboration, and the court overruled the objection. The prosecutor asked if Julia K. had been convicted of "the Oregon crimes," and she responded that she had no felony record. The prosecutor then asked if Julia K. had been arrested in 2014, to which defense counsel objected on relevance grounds. Julia K. repeated that she had no felony record and the court overruled the objection. Julia K. protested that questions about her arrest record were irrelevant. However, the court directed her to answer. Julia K. then acknowledged she had been arrested in 2014 in Tehama County for petty theft. The prosecutor asked, "you've been arrested multiple times, would that be fair to say," and Julia K. responded, "[a]s a misdemeanor. I'm not a felon. [¶] I guess it would be fair to say I was arrested with misdemeanor charges, yes." In her closing argument, the prosecutor stated Julia K.

35

"didn't want to answer any questions about her criminal history. We had a little rough go at the start."

Evidence Code section 353 provides, in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as *to make clear the specific ground of the objection* or motion . . . ." (Italics added.) Thus, a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).) " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Ibid.*)

" 'Evidence Code section 353 does not exalt form over substance.' " (*Partida, supra*, 37 Cal.4th at p. 434.) "The statute does not require any particular form of objection. Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and *the basis on which exclusion is sought*, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, *of the specific reason or reasons* the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court

36

erred in failing to conduct an analysis it was not asked to conduct." (*Id*. at pp. 434-435, italics added.)

Defendant did not object to this line of questioning at trial on the ground that it constituted hearsay or on the ground that it was prejudicial within the meaning of Evidence Code section 352. Defendant objected to this line of questioning three times. Twice, he only stated "objection" without elaboration. Such objections cannot be claimed to inform the trial court and the prosecution of the basis on which exclusion is sought or the specific reasons the evidence should be excluded. (*Partida, supra*, 37 Cal.4th at p. 435.) On the third occasion, he objected on relevance grounds. Defendant's relevance objection was insufficient to preserve an Evidence Code section 352 claim. (*People v. Alexander* (2010) 49 Cal.4th 846, 905 [defendant, who objected on relevance grounds, forfeited his claim the trial court abused its discretion under Evidence Code § 352 by admitting the evidence].) It was also insufficient to preserve a challenge based on hearsay. (*People v. Horn* (1960) 187 Cal.App.2d 68, 78 [defendant's relevance objection to admission of hospital records did not preserve appellate challenge that records were improper hearsay].) As the Attorney General asserts, defendant has forfeited these contentions on appeal. Defendant does not address this issue generally, or forfeiture specifically, in his reply brief.

In any event, evidence of "mere arrests" is generally inadmissible to impeach a witness. (*People v. Anderso*n (1978) 20 Cal.3d 647, 650; *People v. Medina* (1995) 11 Cal.4th 694, 769; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523.) "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion." (*People v. Chatman* (2006) 38 Cal.4th 344, 373, citing *People v. Wheeler* (1992) 4 Cal.4th 284, 297-300 (*Wheeler*).) However, courts "may and should consider with particular care whether the admission of such evidence might involve undue time,

37

confusion, or prejudice which outweighs its probative value." (*Wheeler*, at pp. 296-297, fn. omitted.)

Assuming it was error for the trial court to permit this cross-examination, the error was harmless. "Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached." (*People v. Felix* (1993) 14 Cal.App.4th 997, 1007-1008; see also *People v. Welch* (1999) 20 Cal.4th 701, 749-750 [whether introduction of other crimes evidence violated Evidence Code section 1101, it was not prejudicial based on the *Watson* standard]; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 755 [it is well-settled that claims of error in the admission of prior crimes evidence are evaluated under the *Watson* standard]; *People v. Perkins* (1984) 159 Cal.App.3d 646, 652 [applying the *Watson* standard to assess prejudice resulting from the erroneous admission of evidence of uncharged offense].) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*Partida, supra*, 37 Cal.4th at p. 439.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*Ibid.*)

While we conclude the trial court should not have permitted this cross-examination, we further conclude that it did not render defendant's trial fundamentally unfair, and further that the admission of this evidence was harmless under *Watson*.

Defendant does not advance an argument as to prejudice, asserting only that the trial court's ruling overruling his objections "violated due process and state law" and that the subject evidence "was inadmissible and unduly prejudicial." "When an appellant fails to raise a point, *or asserts it but fails to support it with reasoned argument and citations to authority*, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785, italics added; see also Cal Rules of Court, rule 8.204(a)(1)(B) [each brief must state each point under a separate heading or subheading

summarizing the point, "and support each point by argument and, if possible, by citation of authority"].)

Based on our review of the trial record, we have no difficulty concluding that it is not reasonably probable that, had the trial court precluded this line of cross-examination, defendant would have achieved a more favorable result. (See *Watson, supra*, 46 Cal.2d at p. 836.) To the extent the error in permitting this line of questioning undermined Julia K.'s credibility in the eyes of the jurors, her testimony was essentially merely cumulative of that of defendant's father and Cathi C.-K. They all testified, in essence, defendant was not at Stanley S.'s house on the day in question and thus could not have committed the charged crimes. The jury obviously rejected this defense. It is not reasonably probable the jury would have embraced it but for the prosecutor's cross-examination f Julia K. concerning her arrest history.

Defendant's contentions—both as to trial error and his claim of prejudice on appeal—are forfeited and, in any event, the error in admitting evidence concerning Julia K.'s arrest record was harmless.

VII

*Prosecutorial Misconduct*

Defendant asserts the prosecutor committed misconduct in (1) refusing to agree to stipulate to the fact of defendant's prior convictions, despite case law indicating this was the proper course, and in insisting on entering the prior conviction records into evidence, and (2) cross-examining Julia K. about her prior misdemeanor arrest.

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct

39

even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.) "To establish misconduct, defendant need not show that the prosecutor acted in bad faith." (*People v. Cortez* (2016) 63 Cal.4th 101, 130, citing *People v. Hill* (1998) 17 Cal.4th 800, 822.)

The alleged misconduct here, implicating the same errors as discussed in parts IV and VI of the Discussion, *ante*, did not rise to the level of a denial of due process. "A defendant's conviction will not be reversed for prosecutorial misconduct" that violates state law "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Couching these contentions in terms of prosecutorial misconduct rather than trial error does not change the result that the errors were nonprejudicial. For the same reasons discussed in reference to prejudice in parts IV and VI, we conclude it is not reasonably probable defendant would have obtained a more favorable result absent these instances of misconduct.

VIII

*Cumulative Error*

According to defendant, the cumulative effect of the errors he raises violated his right to due process. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) Any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

40

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:


_____
ROBIE, J.


_____
MAURO, J.

41